Good morning, Your Honor. Tim Loroff on behalf of Appellant Sergio Marquez. I would ask to reserve three minutes for rebuttal. Very well. May it please the Court. This Court should reverse the District Court's order denying the Appellant's motion to suppress because in this case the government failed to meet its burden of proving that the warrantless stop and search of Mr. Marquez was reasonable under the Marquez without a copy of the Transportation Security Administration's policy regarding secondary airport searches. Due to the government's refusal to provide the petitioner or even the District Court with a copy of the TSA policies, the District Court was unable to judge the reasonableness of the stop and search of Appellant and this Court is likewise unable to do so. Mr. Counsel, are you challenging the fact that your client was randomly selected for more intensive secondary screening notwithstanding the fact that all airline passengers must submit to an initial screening through the TSA security station if they wish to fly out of SeaTac Airport? Your Honor, I think the record doesn't show why my client was selected for the secondary search. Well, I guess that's my question. If everybody has to be searched initially, what difference does it make that your client was searched more intensively than the majority of the other people who were also searched prior to boarding the aircraft? Well, I think, Your Honor, that there's an implied consent in administrative searches which Davis has held to go through an initial magnameter and x-ray screening. But isn't the consent implied by the desire to fly? In other words, if your client doesn't want to be searched, he doesn't present himself to the airport to board the airplane. He takes the train, a bus, a boat, whatever it is to get to Alaska. Well, I think that's true, Your Honor, and he did comply with the initial screening and he complied with it with flying colors. And it's the additional secondary screening that I'm arguing is a violation of his constitutional right. You said the policy wasn't provided, but was there any testimony as to what the practice was and what the rule was for selecting people randomly? The first witness the government called to show their burden was Roger Peterson, who was a TSA screener. He made an assertion that airlines pick people to be put into the selectee lane. But interestingly enough, he also testified at page 84 of the record that he himself could pick people. He said, well, in all honesty, we can pick them ourselves, too, but I can't actually – I should not say how, but we know. And in Davis, one of the issues was limiting the discretion under administrative searches of the official in the field. In fact, Davis said the decision to search the carry-on luggage of a particular passenger is not subject to the discretion of the official in the field. The testimony of Mr. Peterson was that he did have that discretion. Furthermore, the government never introduced any evidence as to why Mr. Marquez was selected. His ticket wasn't introduced. There was no evidence introduced from the agent as to why Mr. Marquez was put into the selectee lane. And I think that the government failed in its burden to show that. And I think that the government failed to provide the policy because the court couldn't look at the written policy in camera, even though the district judge in the colloquy at the beginning of the motion to suppress when I asked for it and told the court that I had been asking the government to provide it. Is your case made better if there was a reason to select him for an additional search, or is your case made better if there was no reason to select him for an additional search? Well, Your Honor, I – that's a good question. I don't know because I don't know what the reason was. The thing is the government's asking this court and the district court to trust it. We don't know if Mr. – we don't even know if Mr. Marquez was selected according to this policy because we don't know what the policy is. We don't know if he was searched according to the policy because we don't know what it is. And finally, we don't know if the policy itself contains blatantly unconstitutional caveats on its face. But I guess the question I was pursuing, and I'm not sure you answered it, was what difference does it make if everybody has to be searched? What you're really complaining about is that the search of your client was more intrusive, more intensive, but everybody has to submit at a minimum to putting all their gear on the conveyor belt, taking off their shoes and belts, walking through the magnetometer, and if the magnetometer alerts, they get searched even further. Your complaint, I think, is different from the typical DUI checkpoint cases or the random stops to search vehicles for drugs in that there is no randomness in this system in the sense that everybody has to be searched. Well, there is randomness in the sense that not everyone gets selected to do the secondary search. And in the seminal case of the Terry v. Davis, Terry v. Ohio, the Supreme Court focused on the intrusiveness of a Terry pat-down search. But does Terry really apply when we're talking about administrative searches? I mean, Terry clearly requires that the police articulate a reasonable suspicion before they may conduct a pat-down frisk for weapons or conduct a limited search. And in this case, as I understand what we're talking about at the airport, it falls within the broader rubric, Camaro v. the Municipal Court and so on, of administrative searches. It's akin almost to a border search. I agree, Your Honor, it is. But in Edmonds, the Supreme Court said that individualized suspicion still is not totally given up. Well, then to get back to Justice Candy's question, once the hand wand alarms at your client's belt line, doesn't that give TSA screener Peterson a reason to search further to find out what it is that has triggered the alarm? I think once the alarm rings, the wand goes off, there may be cause to further search Mr. Marquez. But I'm challenging the fact that he shouldn't even have been there in the first place. But how is the wand any different from asking Mr. Marquez to walk through the people-sized magnetometer? I mean, the wand is nothing more than a smaller device that does exactly the same thing that the larger magnetometer. Well, it's a winding. It's being called into a separate lane, having to take your shoes off, not being free to leave, having to have a wand go over you. But I'm trying to understand what the constitutional significance is just because different technology is employed to do the same thing. Why is that unreasonable under the Fourth Amendment? It's unreasonable because what if the policy says that all men wearing turbans are to be searched, or all men that are black are to be searched, or we're going to search everyone that we think is a Muslim? We don't know if the policy says that. But they're all going to be searched if they want to get on the airplane, at least to the extent of having to go through what I'll call the primary searches. That's true, Your Honor. But as recognized by this very court in U.S. v. $124,570, while narrowly defined searches for guns and explosives are constitutional, a generalized law enforcement search of all passengers as a condition for boarding would plainly be unconstitutional. And as Professor LaFave notes – Are you now challenging that? You're saying the government doesn't have the right to search anybody who gets on an airplane, notwithstanding what happened on September 11th and before? No, Your Honor. I'm challenging that they don't have the right to randomly, and according to some possibly unconstitutional policy, selectively pick people and then subject them to a more intrusive Terry sort of stop. And they could be doing that on the basis of race or religion or any other reason. I think we understand your argument. Do you want to reserve the rest of your time? One question. I didn't see in your brief an attack on the failure of the government to provide its procedures. All I read in there is a statement that lacking articulable suspicion, they shouldn't have subjected your client to an additional search. Was there any – I just didn't see in your brief a complaint about not getting the procedure. Your Honor, I complained about it both at the district level and I complained about it – I mentioned it in my brief under the standard of reasonable that all administrative searches are subject to. I didn't specifically make it a separate point in the brief. Thank you very much. Ryan. Thank you. Good morning, Your Honors. May it please the Court. My name is Mike Lang, Assistant United States Attorney for the Western District of Washington. This case is about balancing public safety against the rights of the individual in a reasonable manner. This was a reasonable administrative search for weapons and explosives. The object of the search was airline safety. And Mr. Marquez – the search of Mr. Marquez was minimally intrusive. It was the least intrusive means to achieve the objective of airline safety. It was no more extensive than what millions of air travelers are subjected to every day around this country. And it just so happens that in the process of this search, contraband, evidence of a crime, was found during a legitimate, reasonable administrative search. Counsel, what's your response to opposing counsel's argument that there must be some indication of why the client was selected for the more intense scrutiny? Your Honor, I would turn the Court's attention to Torbett, the case decided by this Court three years ago, in which this Court wrote, a random post-X-ray search of passengers' bags for weapons or explosives does not violate the Fourth Amendment. Well, I guess his argument is, we don't know if it were random, because we don't know the criteria that was used to select his client for more intense scrutiny. Well, Your Honor, as I can – I guess this would be a good time in answer to your question, or perhaps to clarify the record presented by Mr. Loraff today. When he said that the government refused to provide the TSA policies, in fact, we did not refuse to do that. And the record is clear on that at page 82, where the Court asked – I mean, one of the things would be that the Court would look at the TSA policies in camera. I answered yes. The Court said, I understand your position. And the Court then said, let's see how pertinent it is to the situation after we hear the testimony, okay? The Court later, at page 133 of the transcript, said the policies are of no moment to the Court. The Court did not care to see the policies, because they didn't matter at all to the Court's decision in this case. What the Court noted is that the entire – Mr. Marquez was in a lane, an entire lane of people who were selected at random, who were going to be searched no matter what. The screener who searched him, Mr. Peterson, had no idea why they were selected, didn't even know if they set off the magnetometer, did not care, because he was going to focus on the individual in front of him. There was no need for individualized suspicion in this case. And because of that, the – and the screening was minimally intrusive. Because of that and because of the case law presented previously by this Court, this – the search of Mr. Marquez was reasonable. Was there any testimony about what procedures are followed when evidence of crime is discovered and what the arrangements are with the law enforcement authorities? Yes, Your Honor, there was testimony. Mr. Peterson was asked, you know, what would you do if you found evidence of a crime and, for example, if the person tried to walk away. And he said that they would follow the person. They do not have arrest authority, these screeners. He also said their policy in terms of if they find evidence of a crime is they're supposed to call the Port of Seattle Police. This is at page 116 of the record. If someone tried to leave, they would follow them, but they would not try to arrest them. There was no testimony by anybody suggesting that they were there to look for evidence of a crime. And that is a key distinction in all the cases, including the currency case cited by counsel. That was the greatest concern of this Court in the $124,000 currency, that the search there was actually – they were using an administrative search and trying to find generalized evidence of crime. And because of that, this Court struck that down. Well, they had a reward system, too. Yes, Your Honor, they did. And that was a major part of the problem for this Court. Airport searches are reasonable under Torbett and the previous cases, Davis, Polito-Vacquerizo, and the currency case if they meet three criteria. It's confined in good faith to a search for weapons or explosives, which was what we had here. They are minimally intrusive. And third, if the airline passengers can avoid the search by electing not to fly. Mr. Peterson testified that this was a search limited for weapons or explosives, quote-unquote, anything that could bring a plane down. And when he saw it, when he did the hand wand over Mr. Marquez and it alerted to the rivet, he was concerned. And he tried to touch it to what he testified to was, quoting, resolve the alarm. And it was at that point that he felt the hard object. And when he felt that hard object, he, based on his training and experience, was concerned that it was C-4, something that could bring a plane down. Because of that, he was required to resolve the alarm and make sure that Mr. Marquez was not carrying something that could harm the passengers. He was focused on weapons and explosives. This search was also limited in duration. As this Court is probably aware, a typical hand wanding takes less than 30 seconds. It is the least intrusive means possible to achieve the government objective, i.e., airline safety. You wave a wand over somebody's body, if it alerts, then you have to resolve the alarm. And Mr. Peterson had to resolve it by touching it and examining the object. Judge Lasnik himself said he had no problem whatsoever with Mr. Peterson touching that area in order to try to resolve the alarm to see what was beneath the rivet. And, in fact, the judge pointed out, you know, if people can just say, well, that's a rivet and nobody can go any further, then, of course, terrorists or those intending to do harm to airlines are going to hide things under rivets. Counselors, I understand Mr. Lohraff's position. It's up to that point that he's disputing. He doesn't dispute that once the wand alarmed that the screener has the right to conduct a further search. The question is, what led Mr. Marquez to the secondary, if we can call it that, search? And was that a permissible selection? Your Honor, it was permissible in the fact that it was random. And that's all that's required under Torbett, at the least, and under the entire line of administrative search cases by this Court. Well, how do we know that it's random? Peterson didn't know why Marquez was selected. For whatever reason, the district court did not look at the policy, and it's not in the record, so we can't examine it. We don't know why Mr. Marquez was selected. Maybe it was because he was wearing a turban. Your Honor, everybody in that line, the pre-selectee lane, was searched. But, Counsel, I mean, everybody who gets selected for the secondary search goes to one line. That doesn't help us with the question of how do they get to the line. What Mr. Peterson testified to was that the airlines is the company or the organization that selects these people randomly. That is what was in the record, and they were screened or selected by the airline. Mr. Peterson said, we didn't have anything to do with it. We, as TSA screeners, could select people at random. The only time we do that is when they are, when it's a slow work day and we can select people. But that wasn't the case here. It was the airlines, through whatever policy they have in place, that selects people. Well, Judge Lasnik said the only reason he could think that it would be impermissible for people to be selected for any reason is based on ethnic heritage. If, in Judge Lasnik's words, it was an individual who had a Hispanic surname, obviously that would be impermissible. And the court assumed that there's, that just would not be in any of the policies. He said it could potentially be a practice. But Judge Lasnik then referred to his own experience and said, I've been selected randomly for this. And said, this is not something that is race-based, based on his own experience. And I think based on what we all know happens at airports. It is not racially based. It is not something that is unconstitutionally based. This court has held in Torbit that any X-ray scan that doesn't rule out every possibility of dangerous contents is inconclusive. Given these circumstances, a random post-X-ray search of passengers' bags for weapons or explosives does not violate the Fourth Amendment. I would submit to this court that the Torbit holding can be applied as well to passengers. A random post-X-ray search of passengers for weapons or explosives does not violate the Fourth Amendment. Fourth Amendment law, as it has been interpreted by administrative searches, is basically a balancing test between the public interest involved and the intrusion involved. The public interest in this case could not be more compelling. If another airplane goes down on U.S. soil in a terrorist attack due to the lives lost, the impact on our economy, the psychic toll that would take would last for years. On top of that, you have to think about what can cause that destruction. On 9-11, it was a box cutter. With Richard Reid, it was a shoe bomb. With Ahmed Rassam, it was liquid nitroglycerin. Bombs can be plastic, liquid, or solid. There has to be some means by which administrative searches can examine people for all those sorts of objects. They may not set off the magnetometer. They may not be revealed in an X-ray machine. These items are very small. They could feasibly bypass the first level of security. You have to balance that against the intrusion. This is a search that lasts about 30 seconds. It involves running a hand wand over a person for a short period of time. It involves a visual inspection. In light of that, the intrusion and the compelling government need, the balance tips clearly in favor of the search conducted here. This second level of screening was reasonable. In conclusion, and in light of that balance, and in light of the reasonableness of the search, I would ask that this Court affirm the order and judgment of the District Court. Thank you. Thank you very much. Mr. Loraff, you have a minute and 13 seconds. Thank you, Your Honor. First of all, under Kyles v. Whitley, the government speaks for the Transportation Security Administration. And as Mr. Lang noted at page 81 of the record, the TSA was not willing to provide the policy, so the government did refuse to provide it to them. Well, that's not quite correct. As counsel points out, Judge Lasnik was offered an in-camera review, and he said, well, let me hear the testimony first, and I'll decide whether or not I even need to see the policy. And apparently he decided, based on what he heard, he didn't need to see it. No, he wasn't offered an in-camera. He mentioned the possibility of having an in-camera, but they hadn't brought it to court. So he couldn't do an in-camera, even if he wanted to. Well, they could certainly have submitted it to him afterwards if he'd asked for it. I'm not sure it's a fair characterization to say they flat-out refused to produce it. But, Your Honor, I think that's the point is the district court erred by not ordering it to be produced because we don't – the government asserts an oral argument that we all know it's not a racial test, and I assert we don't know that at all. We do not know. We don't know if this policy says that people of Arab descent, or people like Mr. Marquez who have a Latino last name should be searched. We don't know that, and that's the point why this Court cannot say that it was a reasonable search. In times like today, when the nation does face these threats, it's when we have to be extra careful to protect our precious constitutional rights. Airport security is obviously correctly regarded as a highly significant concern. What the appellant asked this Court to do – Counsel, thank you. Your time is up. Thank you. The case just argued is submitted. We will now hear argument in the case of Sergeant Emiliano Santiago versus Secretary of Defense Donald Rumsfeld.
judges: Canby, Tallman, Rawlinson